**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

ERIC JOHNSON, also known as Debah J.
Smith,

                                        Plaintiff,

        v.                                                      No. 08-CV-158
                                                                        (FJS/DRH)

ANKESH NIGAM; ROGERS,[1] John Doe;
AYSHIA ENU, Physician, Hudson
Correctional Facility; PETER BOGARSKI;
REUTENEAUR,  Jane Doe; McCOY, John
Doe; H.M. MILES; JOYCE DUKE; WOLFF,
John Doe; ROTHER, Jane Doe; GEORGE,
John Doe; TESTO, John Doe; PETER
BEHRLE; M.GRAZIANO; MICHAEL
AMBROSINO; PHILIP HEATH; T. MAHAR,
Senior Correction Counselor, Greene
Correctional Facility; T. GAINES;
CAULFIELD, John Doe; JOHN DOE 1;
JOHN DOE 2; KAREN MEICHT, Nurse,
Hudson Correctional Facility; WINNIE,
Lieutenant, Hudson Correctional Facility;
and COFFEY, John Doe,

        Defendants, Cross-Claimants, and
        Cross-Defendants.

_____

**APPEARANCES:**                                      **OF COUNSEL:**

ERIC JOHNSON
c/o DEBAH J. SMITH
Plaintiff Pro Se
126 Albany Avenue # 314A
Brooklyn, New York 11213

D'AGOSTINO, KRACKELER, MAGUIRE &          MAE A. D'AGOSTINO, ESQ.
        CARDONA, P.C.                                      MIA D. VANAUKEN, ESQ.
Attorney for Defendants Nigam and Rodgers
The Sage Mansion
_____

        [1] Defendant Rogers name is incorrectly spelled in the amended complaint.  See
Dkt. No. 65.  The correct spelling is Rodgers.  See Rodgers Affirm. (Dkt. No. 94-4) at 1.
The correct spelling will be used herein.

16 Sage Estate
Menands, New York 12204

HON. ANDREW M. CUOMO                     DEAN J. HIGGINS, ESQ.
Attorney General for the                 Assistant Attorney General
  State of New York
Attorney for State Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[2]

Plaintiff pro se Eric Johnson ("Johnson"), formerly an inmate in the custody of the New

York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42

U.S.C. §§ 1983 and 1985 alleging that defendants, twenty-one DOCS employees and two

private physicians, violated his constitutional rights under the Eighth and Fourteenth

Amendments.  Am. Compl. (Dkt. No. 64).  Presently pending is the private physician

defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 94.[3]

Johnson opposes the motion.  Dkt. No. 113.  For the following reasons, it is recommended

that defendants' motion be granted.


### I. Background

#### A. Dr. Nigam

Dr. Nigam is a general surgeon employed by Albany Medical College ("AMC").  Nigam

_____

[2]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[3]The State defendants have not moved for summary judgment.  the deadline for
any such motion does not expire until September 30, 2010.  See Text Order filed 7/22/10.

Aff. (Dkt. No. 94-2) ¶¶ 1, 6.  Dr. Nigam first met Johnson on January 5, 2007 when Johnson was referred to AMC for a surgical consult.  Nigam Aff. ¶ 9; Am. Compl., Facts ¶ 22;[4] Johnson Aff. (Dkt. No. 113 at 37-44) ¶ 19.  Dr. Nigam took a medical history which included Johnson's history with Hepatitis B.  Nigam Aff. ¶ 10; Dkt. No. 94-12 at 8; Dkt. No. 113 at 10.  Dr. Nigam also personally reviewed Johnson's CT scans and noted a mass in Johnson's pancreas. Nigam Aff. ¶ 10; Dkt. No. 94-12 at 8; Dkt. No. 113 at 10, 17-18; Dkt. No. 94-19 at 1-3.  Despite this mass, Johnson denied abdominal pain, problems eating, or experiencing shortness of breath or chest pain and Dr. Nigam's physical examination found Johnson's abdomen to be "soft and nontender without masses," or swelling.  Nigam Aff. ¶ 10; see also Dkt. No. 94-12 at 8; Dkt. No. 113 at 10.[5]

Dr. Nigam explained that Johnson "appear[ed] to have a lesion at the tail of his pancreas which may be a neuroendocrine tumor."  Nigam Aff. ¶ 10; Dkt. No. 94-12 at 8; Dkt. No. 113 at 10.  Dr. Nigam speculated that the tumor was benign but explained that definitive conclusions were difficult without resecting the mass.  Nigam Aff. ¶ 10; Am. Compl., Facts ¶ 24 ("[Dr. Nigam's] primary focus of treatment was surgical removal."); Dkt. No. 94-12 at 8; Dkt. No. 113 at 10.  Dr. Nigam believed a resection could be performed laproscopically and that Johnson would require immunizations before surgery because he

---

[4]The amended complaint is not notarized as was the original complaint but contains the statement above Johnson's signature that "I declare under penalty that the foregoing is true and correct."  Am. Compl. at 31; Dkt. No. 1 at 21.  Both verifications suffice to require that these documents be considered in opposition to the pending motion as long as the other requirements of Rule 56(e) are satisfied, including personal knowledge, admissibility, and competency.  Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002); Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995).

[5] Johnson's amended complaint alleges two instances of stomach discomfort, both prior to his appointment with Dr. Nigam.  Am. Compl., Facts ¶ 23.

would also be required to have his spleen removed along with his pancreas.  Nigam Aff. ¶ 10; Am. Compl, Facts ¶¶ 24-31 (explaining the discussion Johnson had with Dr. Nigam, outlining the surgical procedures, the unreliability of the definitiveness of a needle biopsy, and subjectively detailing Johnson's fears at the prospect that the tumor might be cancerous and spreading); Dkt. No. 113 at 10; Johnson Aff. ¶ 20; Dkt. No. 94-12 at 7-8. Johnson stated that he understood the risks and benefits and wanted to progress with surgery.  Nigam Aff. ¶ 10; Dkt. No. 113 at 10; Johnson Aff. ¶ 22 ("I agreed to proceed with the surgical plan, for fear of cancer.").

Dr. Nigam began arranging for the surgery by writing Johnson a prescription for various vaccines and pre-operative testing orders and scheduling a time and place for the surgery to occur.  Nigam Aff. ¶ 10.  Johnson reviewed and signed the informed consent documents, which specified that he might be required to undergo open surgery and blood transfusions. Nigam Aff ¶ 10; Johnson Aff. ¶ 23; Dkt. No. 94-12 at 22.  Johnson underwent the pre-operative procedures and signed consent for anesthesia.  Nigam Aff. ¶ 10; Am. Compl., Facts ¶ 30 (outlining potential complications of surgery including blood transfusion, antibiotics, and digestive complications); Dkt. No. 94-12 at 23-34.

Surgery was scheduled for January 30, 2007.  Nigam Aff. ¶ 11.  Prior to the procedure, Johnson and Dr. Nigam had a long discussion whereupon Johnson expressed his hesitancy to undergo surgery and inquired instead about a biopsy to determine whether the tumor was malignant.  Nigam Aff. ¶ 11; Am. Compl., Facts ¶¶ 32-34 (detailing that upon further consideration and research Johnson preferred to undergo a needle biopsy, feeling that the risks involved in surgery were too great without knowing definitely whether the tumor was cancerous); Dkt. No. 94-13 at 3; Dkt. No. 113 at 11; Johnson Aff. ¶ 27.  Dr. Nigam told

4

Johnson that he did not have to undergo the surgery and that he could have the mass biopsied, but that waiting posed a slight risk in the event that the mass was cancerous. Nigam Aff. ¶ 11; Am. Compl, Facts ¶¶ 41-43; Dkt. No. 94-13 at 3; Dkt. No. 113 at 11.  The surgery was cancelled and instead, Johnson was given the opportunity to have the mass biopsied.   Nigam Aff. ¶ 11 (outlining that Johnson decided he no longer wished to have surgery); Am. Compl., Facts ¶¶ 44-47; Dkt. No. 94-13 at 3; Dkt. No. 113 at 11; Johnson Aff. ¶¶ 27-28 (stating that Dr. Nigam cancelled the procedure and that he did not refuse to consent to it, however after the surgery was terminated a biopsy was the planned subsequent step).  Dr. Nigam wrote Johnson an order for a biopsy to occur on April 5, 2007. Nigam Aff. ¶ 12; Dkt. No. 94-13 at 5.  Johnson contends that the biopsy was not given the appropriate priority.  Am. Compl., Facts ¶ 49.

On June 6, 2007, a third party performed an endoscopy to biopsy the mass.  Nigam Aff. ¶ 13; Dkt. No. 94-13 at 17; Dkt. No. 113 at 12; Johnson Aff. ¶ 30.  However, during the procedure, the mass could not be visualized and thus could not be biopsied.  Nigam Aff. ¶ 13; Dkt. No. 94-13 at 17; Dkt. No. 113 at 12; Johnson Aff. ¶ 30.  Instead, the third party recommended a follow-up CT and MRI scans to determine whether the mass still existed. Nigam Aff. ¶ 13.  On September 7, 2007 a CT was taken which showed the same mass in Johnson's pancreas.  Nigam Aff. ¶ 14; Am. Compl., Facts ¶¶ 77-78; Dkt. No. 94-13 at 24-25; Dkt. No. 94-18 at 22.[6]

---

[6] Johnson contends that the size of the pancreatic tumor was slightly different in his later scan, indicating that potentially some of the tumor had been excised during the biopsy. Am. Compl., Facts ¶¶ 83-84.  It is undisputed that there was never any biopsy results produced for the tumor and that Johnson still does not know whether it is malignant.

Dr. Nigam saw Johnson again on December 3, 2007 during which Johnson's medical history and experiences with the pancreatic mass were reviewed.  Nigam Aff. ¶ 15; Dkt. No. 94-13 at 30, 33; Dkt. No. 113 at 14; Johnson Aff. ¶ 32.[7]  Dr. Nigam advised that it could not be known whether the mass was cancerous without excising it because even a successfully executed biopsy had "inherent[ly] false negative results."  Nigam Aff. ¶ 15; Am. Compl., Facts ¶ 83; Dkt. No. 94-13 at 30; Dkt. No. 113 at 14; Johnson Aff. ¶ 33.  Dr. Nigam indicated that because the mass remained stable it probably was not cancerous, but that the only way to be absolutely sure was to remove the entire mass.  Nigam Aff. ¶ 15; Dkt. No. 94-13 at 30, 33; Dk. No. 113 at 14.  Johnson became frustrated with the inability to diagnose definitively.  Nigam Aff. ¶ 15; Dkt. No. 94-13 at 30; Dkt. No. 113 at 14.  Johnson was again faced with the choice of postponing surgery and obtaining another biopsy  or undergoing surgery.  Nigam Aff. ¶ 15; Dkt. No. 94-13 at 30, 33; Dkt. No. 113 at 14.

Johnson again decided to forego surgery of any kind.  Nigam Aff. ¶ 15; Dkt. No. 94-13 at 30; Dkt. No. 113 at 14.  Even though Johnson decided against it, Dr. Nigam still recommended surgery and suggested Johnson obtain "a second opinion to attempt to clarify for himself in his mind the limits in diagnosing cancer without surgery."  Nigam Aff. ¶ 15; Dkt. No. 94-13 at 30, 33; Dkt. No. 113 at 14; Johnson Aff. ¶¶ 33-34.  This was the last time that Dr. Nigram treated Johnson.  Nigam Aff. ¶ 16.  In the Spring of 2008, Johnson underwent another CT scan and the pancreatic mass appeared stable and unchanged in

---

[7] Johnson indicates that this meeting occurred in March of 2008, however this appears to be an inadvertent misreading of the document.  Johnson Aff. ¶ 32.  The documentation which Johnson provided indicated December 3, 2007, the date indicated by Dr. Nigam, as the date of service, and March 14, 2008, as the date of review of the medical notes.  Dkt. No. 113 at 14.  Accordingly, the date of service controls.

size.  Am. Compl., Facts ¶ 88; Johnson Aff. ¶ 36.  Johnson refused any subsequent

treatment for these conditions while incarcerated.  Am. Compl., Facts ¶¶ 89-90; Johnson

Aff. ¶ 36; Dkt. No. 94-16 at 29-30.

Upon release from prison, Johnson began receiving treatment at Columbia-

Presbyterian Hospital where it was determined that he had both liver and pancreatic cancer.

Dkt. No. 113 at 19; Johnson Aff. ¶ 37.  Johnson underwent biopsies of his liver and

pancreas in the Winter of 2009.  Dkt. No. 113 at 29.  On March 30, 2010, Johnson

"underwent right hepatectomy and distal pancreatectomy surgery . . . for . . . cancer."  Dkt.

No. 113 at 20; see also Johnson Aff. ¶ 37.


**B. Dr. Rodgers**

Johnson was treated by defendant Dr. Enu in the Spring of 2006 for Hepatitis B.

Rodgers Aff. ¶¶ 1, 6; Am. Compl., Facts ¶¶ 1-3.  In August 2006, Johnson's laboratory

results for liver function and viral load revealed levels elevated from earlier in the year.

Rodgers Aff. ¶¶ 10-11; Am. Compl., Facts ¶¶ 4-5 .  Dr. Enu discussed the results with

Johnson, and Johnson stated that "his liver function tests [we]re always normal and that he

d[id] not believe the results of the current liver function test."  Rodgers Aff. ¶ 12; Am.

Compl., Facts ¶ 6.  The test was repeated and the results "revealed a very high count on

the viral load."  Rodgers Aff. ¶ 13.

Dr. Enu referred Johnson to Dr. Rodgers for evaluation as he specialized in

gastroenterology and also worked for AMC.  Rodgers Aff. ¶ 13.  On September 20, 2006,

Johnson underwent more laboratory testing for his liver function and the results again

showed elevated levels.  Rodgers Aff. ¶ 14.  Dr. Rodgers first evaluated Johnson on

October 25, 2006.  Rodgers Aff. ¶ 15; Dkt. No. 94-12 at 1; Dkt. No. 94-19 at 23; Am.

Compl., Facts ¶ 8; Dkt. No. 113 at 21; Johnson Aff. ¶ 14.  Johnson had a variant type of

Hepatitis, he had likely been infected for a long time, this type of Hepatitis quickly

developed resistance to previously prescribed drug therapies, and Johnson currently had

unusually high viral loads which left him at risk for developing cirrhosis of the liver or cancer.

Rodgers Aff. ¶ 15; Dkt. No. 94-12 at 1; Dkt. No. 94-19 at 23; Dkt. No. 113 at 21.  Johnson

contends he was under orders to receive a liver biopsy, but that Dr. Rodgers never

discussed this diagnostic test with him.  Johnson Aff. ¶ 15.[8]  Instead, given the high viral

loads, Dr. Rodgers recommended starting a prescription treatment, Hepsera, and having

labs drawn every two months with viral loads tested every six months.  Rodgers Aff. ¶ 15;

Dkt. No. 94-12 at 1; Dkt. No. 94-19 at 23; Am. Compl., Facts ¶ 8; Dkt. No. 113 at 21.  Dr.

Rodgers also recommended a CT of Johnson's abdomen for any cirrhosis or liver damage.

Rodgers Aff. ¶ 15; Dkt. No. 94-12 at 1; Dkt. No. 94-15 at 23-24; Dkt. No. 94-19 at 23; Dkt.

No. 113 at 21.  Johnson consented to the treatment.  Am. Compl., Facts ¶ 9.

When Johnson was seen by Dr. Enu in October 2006, she ordered him Hepsera and

scheduled the recommended lab testing.  Rodgers Aff. ¶ 16; Dkt. No. 113 at 22; Johnson

Aff. ¶ 16.[9]  Johnson began experiencing abdominal pains, met with another physician, and

began researching the side effects of Hepsera.  Am. Compl., Facts ¶¶ 10-12; Johnson Aff.

---

[8] Medical records indicate that Johnson was offered, and highly recommended to
undergo, liver biopsies in the spring and summer of 2008.  Dkt. No. 94-14 at 5, 8-10, 12-
14; Dkt. No. 94-10 at 5-6.  This lesion was noted as a new lesion after the diagnostic
scans which occurred on September 2007.  Dkt. No. 94-14 at 12; Dkt. No. 94-20 at 5.
Johnson refused the procedures.

[9] Dr. Rodgers prescribed the Hepsera.  Am. Compl., Facts ¶ 9.

8

¶ 16.  Johnson returned to Dr. Enu a week later with questions about the Hepsera treatment.  Rodgers Aff. ¶ 17; Dkt. No. 113 at 24.  He believed that the side effects were too severe and wanted to cease treatments to avoid potential complications, feeling "tricked" into consenting to treatment.  Am. Compl., Facts ¶ 12-13. Dr. Enu explained to Johnson the importance of his compliance with the treatment regimen.  Rodgers Aff. ¶ 17. Johnson also underwent a CT scan of his abdomen on November 24, 2006 and an MRI on December 18, 2006.  Rodgers Aff. ¶ 18; Dkt. No. 94-12 at 2-6; Dkt. No. 113 at 17-18; Johnson Aff. ¶ 17.

On January 24, 2007, Dr. Rodgers saw Johnson for the second time.  Rodgers Aff. ¶ 20; Dkt. No. 94-19 at 22; Dkt. No. 113 at 25.  Dr. Rodgers noted that Johnson's liver test results from December 27, 2006 were normal and that the CT and MRI were negative for liver cancer.  Rodgers Aff. ¶ 21; Am. Compl., Facts ¶ 20; Dkt. No. 94-19 at 22; Dkt. No. 113 at 25.  At this time, Johnson felt that his treatment's focus shifted from his liver, to his pancreas, and the tumor which was discovered therein.  See supra; Johnson Aff. ¶ 18.  Dr. Rodgers intended to continue on the recommended treatment plan and to follow-up with Johnson in three or four months unless he was paroled.  Rodgers Aff. ¶ 22; Dkt. No. 94-19 at 22; Dkt. No. 113 at 25.

On March 14, 2007, Dr. Rodgers saw Johnson again.  Rodgers Aff. ¶ 23; Dkt. No. 113 at 26; Dkt. No. 94-19 at 19.  Johnson voiced concerns to Dr. Rodgers about the progression of the disease if he discontinued using Hepsera.  Rodgers Aff. ¶ 23; Dkt. No. 113 at 26; Dkt. No. 94-19 at 19.  Dr. Rodgers informed Johnson that the disease would worsen if he discontinued taking the Hepsera and Johnson became upset that he had begun the drug therapy because his condition had remained stable without it.  Rodgers Aff. ¶ 23; Am.

9

Compl., Facts ¶ 62; Dkt. No. 94-19 at 19; Dkt. No. 113 at 26.  Johnson informed Dr.

Rodgers that he might soon be paroled.  Rodgers Aff. ¶ 23; Dkt. No. 94-19 at 19;  Dkt. No.

113 at 26.  Dr. Rodgers recommended two different treatment plans, one if Johnson was

paroled and a second if he remained incarcerated.  Rodgers Aff. ¶ 23; Am. Compl., Facts ¶

61; Dkt. No. 94-19 at 19;  Dkt. No. 113 at 26.  Either way, Dr. Rodgers indicated that if

Johnson refused to continue having his lab work taken, his prescription should be

discontinued.  Rodgers Aff. ¶ 23.

On July 25, 2007, Dr. Rodgers saw Johnson for the final visit.  Rodgers Aff. ¶ 24; Dkt.

No. 113 at 27; Johnson Aff. ¶ 31; Dkt. No. 94-19 at 10.  While taking the Hepsera,

Johnson's viral load was barely detectable and that his liver function tests were within

normal and close to normal range.  Rodgers Aff. ¶ 24; Dkt. No. 113 at 27; Dkt. No. 94-19 at

10.  Dr. Rodgers again discussed with Johnson the need to continue on that treatment and

answered Johnson's many questions, ultimately advising Johnson "that if he were to

discontinue his treatment and not treat his Hepatitis disease, that he would be at risk of

developing cirrhosis and cancer of the liver."  Rodgers Aff. ¶ 24; Dkt. No. 113 at 27; Dkt.

No. 94-19 at 10; Johnson Aff. ¶ 31.  Dr. Rodgers told Johnson that the Hepsera was

effectively "keep[ing] his viral load very low and if it were to increase without the treatment,

he would be at risk of developing cirrhosis . . . and cancer . . . ."  Rodgers Aff. ¶ 24; see also

Am. Compl., Facts ¶ 76; Dkt. No. 113 at 27; Dkt. No. 94-19 at 10.  Additionally, Dr. Rodgers

advised that because Johnson's strain of Hepatitis was variant, ceasing treatment could

preclude him from every being able to take the drug again because stopping treatment

might render him immune from the Hepsera.  Rodgers Aff. ¶ 24; Dkt. No. 113 at 27; Dkt.

No. 94-19 at 10.  The choice whether to continue treatment was Johnson's, but if he failed

to comply with the blood tests, the prescription would be terminated.  Rodgers Aff. ¶ 24;

Dkt. No. 113 at 27; Johnson Aff. ¶ 31.

## II.  Discussion

With respect to Drs. Nigam and Rodgers, Johnson alleges that they violated his Eighth

Amendment rights by failing to (1) offer him a timely biopsy of either his pancreas or liver,

(2) investigate and discover the underlying cause of his elevated liver levels and pancreatic

mass, (3) first refer him to an oncologist, and (4) inform him fully of the risks and benefits of

all the proposed treatments.[10]  Additionally, Johnson contends that these defendants

---

[10] To the extent that Johnson's claims may be construed as pendant state law claims alleging lack of informed consent prior to treatment, such claims must fail.  Federal courts have supplemental jurisdiction over pendent state law claims pursuant to 28 U.S.C. § 1367.  It is recommended herein, however, that Drs. Nigam and Rodgers be granted judgment on Johnson's federal claims against them on which rests federal jurisdiction over the pendent state law claims.  Johnson asserts no other basis for the Court's jurisdiction over these claims and, therefore, the Court should decline to exercise supplemental jurisdiction over Johnson's state law claims if the recommendations herein are accepted.  See 28 U.S.C. § 1367(c)(3).  Accordingly, such causes of action should be dismissed without prejudice.

Moreover, even if the state law claims are addressed, they still fail.  In order to state an actionable claim for failure to provide informed consent:

plaintiff must prove (1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury.

Foote v. Rajadhyax, 702 N.Y.S.2d 153, 153 (N.Y. 2000) (citations omitted).  In this case, Johnson decided against undergoing surgery with Dr. Nigam, so it is impossible for him to prove an injury proximately caused by his consent to surgery.  Furthermore, Dr. Rodgers' treatment improved Johnson's health and, therefore, Johnson has failed to establish any

conspired to provide unnecessary medical treatment.  Drs. Nigam and Rodgers contend that Johnson's claims are meritless.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Section I supra.  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

---

injury resulting from his consent to the Hepsera treatment.

12

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

### B. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  This prohibition extends to the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to

state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting

Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a

serious medical condition is determined by factors such as "(1) whether a reasonable doctor

or patient would perceive the medical need in question as 'important and worthy of

comment or treatment,' (2) whether the medical condition significantly affects daily

activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d

158, 162-63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).

The severity of the denial of care should also be judged within the context of the

surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of

and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus,

prison officials must be "intentionally denying or delaying access to medical care or

intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S.

97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional

claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703.  Thus,

"disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms

of treatment, or the need for specialists . . .  are not adequate grounds for a section 1983

claim."  Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312

(S.D.N.Y. 2001).  Furthermore, allegations of negligence or malpractice do not constitute

deliberate indifference unless the malpractice involved culpable recklessness.  Hathaway v.

Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

In this case, Drs. Nigam and Rodgers do not appear to challenge the fact that Hepatitis

B and its potential complications or the resulting malignancies in Johnson's pancreas and

liver were serious medical needs.  However, these defendants contend that they were not deliberately indifferent.

### 1. Dr. Nigam

The gravamen of Johnson's complaints against Dr. Nigam was that Dr. Nigam was not receptive enough to a biopsy, he did not work hard enough to find alternate ways to determine whether the tumor was malignant, and he did not refer Johnson to an oncologist. Dr. Nigam's recommendation for resection over a biopsy is not actionable because it results in nothing more than a disagreement over diagnosis and recommended course of treatment. Sonds, 151 F. Supp. 2d at 312.  While this course of treatment was more aggressive than a biopsy, it was not inadequate. Chance, 143 F.3d at 703.  If anything, such a treatment recommendation arguably provided more medical care than was initially indicated to ensure that, if Johnson did have pancreatic cancer, the entire tumor was excised at once instead of requiring additional procedures after the results of the biopsy were known.  Nigam Aff. ¶¶ 10, 15; Am. Compl., Facts ¶¶ 24, 83; Dkt. No. 94-12 at 8; Dkt. No. 113 at 10, 14; Johnson Aff. ¶ 33.  Such actions belie any allegations of deliberate indifference or delay.

Furthermore, Johnson was not precluded from undergoing a biopsy and more conservative method of diagnosis .  Dr. Nigam provided Johnson with the referral for the biopsy the same day that he was scheduled for surgery.  Nigam Aff. ¶¶ 11-12; Dkt. No. 94-13 at 5; Am. Compl., Facts ¶¶ 44-47.  As such, there was no delay on the part of Dr. Nigam in ensuring that Johnson received some diagnostic mechanism to determine whether the mass was cancerous.  After the referral, Dr. Nigam was not involved in the scheduling or

15

performance of the biopsy.  Nigam Aff. ¶ 13; Dkt. No. 94-13 at 17; Dkt. No. 113 at 12; Am.

Compl., Facts ¶¶ 83-84.  Therefore, any arguable delay in receiving the biopsy was not

attributable to his actions.  Moreover, it is undisputed that the biopsy was performed

approximately one month after Johnson refused the surgery.  Nigam Aff. ¶¶ 12-13; Johnson

Aff. ¶ 30.  One month does not constitute an inordinate delay for examination by a specialist

for a condition which was not an emergency.  Moreover, any delays in rescheduling are

principally attributable to Johnson as he changed his mind after he had consented to

surgery and allowed that process nearly to reach completion.

Dr. Nigam's conduct also belies any claims of deliberate indifference.  It is undisputed

that Dr. Nigam and Johnson had multiple discussions about his pancreatic mass and the

treatment options.  Nigam Aff. ¶¶ 10-11; Johnson Aff. ¶¶ 20, 27; Dkt. No. 113 at 10-11; Dkt.

No. 94-12 at 7-8; Am. Compl., Facts ¶¶ 24-34, 41-47.  Dr. Nigam quickly arranged for pre-

operative testing and to schedule the surgery.  Nigam Aff. ¶ 10; Dkt. No. 94-12 at 23-34.

On the date of surgery, Dr. Nigam again discussed the details of the surgery with Johnson

which ultimately led to the cancellation of the surgery because of Johnson's expressions of

concern and need for further information.  Nigam Aff. ¶ 11; Dkt. No. 113 at 11; Dkt. No. 94-

13 at 3; Am. Compl., Facts ¶¶ 41-47. Moreover, Dr. Nigam provided Johnson with the ability

to pursue the course of treatment Johnson deemed most appropriate.  Therefore, Dr.

Nigam did not delay or interfere with Johnson's further care.

Lastly, it is evident that a surgical procedure was required, whether it be biopsy or

excision, to determine whether or not the tumor was cancerous.  Accordingly, referral to an

oncologist was premature and unnecessary.  Furthermore, Johnson was not constitutionally

guaranteed the medical treatment and specialists that he desired but only those that

16

provide adequate medical care.  Chance, 143 F.3d at 703 ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.") (citations omitted).  Therefore, even viewing the facts in the light most favorable to Johnson, Dr. Nigam undeniably provided such care.

Accordingly, defendants' motion as to Dr, Nigam should be granted on this ground.


### 2. Dr. Rodgers

Johnson contends that Rodgers did not fully investigate the causes for his increased viral loads and liver results, inappropriately prescribed the Hepsera treatment, and failed to pursue a liver biopsy.  Dr. Rodgers' care and treatment of Johnson fails to rise to the level of deliberate indifference.  Johnson presented to Dr. Rodgers with dangerously high viral loads which, untreated, could have resulted in permanent liver damage or cancer.  Rodgers Aff. ¶¶ 10-14; Am. Compl., Facts ¶¶ 4-5.  Johnson did not agree with these test results and medical staff performed multiple rounds of repeat testing to confirm the fact that Johnson's levels were, and remained, elevated.  Rodgers Aff. ¶¶ 12-14; Am. Compl., Facts ¶ 6.  Such confirmatory testing at Johnson's request fails to establish indifference or delay.

Given the fact that each subsequent test confirmed the initial elevated readings, the Hepsera treatment was offered to lower Johnson's levels and prevent the onset of liver damage or cancer.  It is indisputable that the treatment was successful as Johnson's viral loads had decreased to normal levels and he suffered no permanent liver damage.  Rodgers Aff. ¶ 24; Dkt. No. 113 at 27; Dkt. No. 94-19 at 10; Johnson Aff. ¶ 31.  Accordingly, Dr. Rodgers' successfully performed his duties as a physician and was not indifferent in diagnosing or treating the disease.

17

Johnson's argument that his initial elation at the prospect of receiving treatment should have been tempered by Dr. Rodgers with further discussion of the potential side effects is insufficient to establish deliberate indifference.  Johnson was given the choice as to whether or not to participate in the Hepsera treatment.  The fact that he regrets his choice now, based upon purely conjectural side effects is not attributable to Dr. Rodgers.  Furthermore, Johnson was fully able to cease treatment whenever he chose.  The fact that his Hepatitis was resistant and he might not have been able to recommence taking the medication successfully are all facts of which he was aware in determining his health care choices.  Rodgers Aff.  ¶ 24; Dkt. No. 113 at 27; Johnson Aff. ¶ 31; Dkt. No. 94-19 at 10; Am. Compl., Facts ¶ 76.  Because these choices were not optimal did not make the physician liable for them.

Furthermore, Johnson's contentions that Dr. Rodgers should have more aggressively pursued a liver biopsy is not actionable because it results in nothing more than a disagreement over diagnosis and recommended course of treatment.  Sonds, 151 F. Supp. 2d at 312.  Dr. Rodgers sent Johnson for confirmatory diagnostic testing to ensure that there was no cirrhosis or liver cancer.  Rodgers Aff. ¶ 15; Dkt. No. 94-12 at 1; Dkt. No. 94-15 at 23-24; Dkt. No. 94-19 at 23; Dkt. No. 113 at 21.  The test results did not show the presence of either cirrhosis or liver cancer, thus further diagnostic testing by way of a biopsy was not indicated.  Rodgers Aff. ¶ 21; Am Compl., Facts ¶ 20; Dkt. No. 94-19 at 22; Dkt. No. 113 at 25.  Such confirmatory testing was medically adequate.  Furthermore, even if the test results were misread, there is nothing in the record to indicate that such a misreading was done intentionally or with malice.  Accordingly, any such misdiagnoses are at worst negligent, and insufficient to establish a constitutional violation.  See generally Estelle, 429

18

U.S. at 106 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment.").  Moreover, it appears that the medical records indicated the need for further liver biopsies after Johnson had ceased seeing Dr. Rodgers based upon a new lesion discovered sometime after September 2007.  Dkt. No. 94-14 at 12; Dkt. No. 94-20 at 5. Johnson continually refused to undergo any biopsies, therefore, any resulting delay in his diagnosis and treatment is attributable to his own actions.  Dkt. No. 94-14 at 5, 8-10, 12-14; Dkt. No. 94-10 at 5-6.

Accordingly, defendants' motion as to Dr. Rogers should be granted on this ground.


### C. Conspiracy

"Section 1985 prohibits conspiracies to interfere with civil rights."  Davila v. Secure Pharmacy Plus, 329 F. Supp. 2d 311, 316 (D. Conn. 2004). To state a claim for relief under § 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

United Bd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828-29 (1983); see also Iqbal v. Hasty, 490 F.3d 143, 176 (2d Cir. 2007).  "In addition, the conspiracy must be motivated by some class-based animus."  Iqbal, 490 F.3d at 176 (citations omitted).

Here, Johnson does not assert any facts giving rise to a conspiracy.  First, Johnson

19

vaguely asserts conclusory statements relating to an alleged conspiracy among defendants. This is insufficient.  See generally Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999) (granting summary judgment for a § 1985(3) claim where the "assertions were conclusory and vague, and did not establish the existence of an agreement among defendants to deprive [plaintiff] of his constitutional rights.").  Second, there has been proffered no evidence relating to agreements, or even communications, between the  defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive Johnson of his civil rights.  Lastly, there is no evidence that any alleged conspiracy was motivated by racial- or class-based animus.

Accordingly, defendants' motion as to this claim should be granted.


### D. Cross-Claims

Drs. Nigam and Rodgers have asserted cross-claims against the State defendants and the State defendants have asserted cross-claims against Drs. Nigam and Rodgers.  See Dkt. Nos.  77, 79, 103, 109, 119.  For the reasons set forth above, no basis exists for the State defendants cross-claims and, if the recommendations herein are adopted, no basis will exist for the Cross-claims of Drs. Nigam and Rodgers against the State defendants. Accordingly, it is also recommended that all cross-claims in this action be dismissed.


### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. The motion of defendants Drs. Nigam and Rodgers for summary judgment

20

(Dkt. No. 94) be **GRANTED** and that judgment be entered in favor of these two defendants on all claims; and

        2. All cross-claims of all defendants be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. §636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  August 30, 2010
      Albany, New York

                             United States Magistrate Judge