**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

ERIC JOHNSON, also known as Debah J. Smith,

                                                          Plaintiff,

        v.                                                                    No. 08-CV-158
                                                                                  (FJS/DRH)

AYISHA ENU, Physician, Hudson Correctional
Facility; PETER BOGARSKI; REUTENEAUR,  Jane
Doe; McCOY, John Doe; H.M. MILES; JOYCE DUKE;
WOLFF, John Doe; ROTHER, Jane Doe; GEORGE,
John Doe; TESTO, John Doe; PETER BEHRLE; M.
GRAZIANO; MICHAEL AMBROSINO; PHILIP
HEATH; T. MAHAR, Senior Correction Counselor,
Greene Correctional Facility; T. GAINES; CAULFIELD,
John Doe; JOHN DOE #1; JOHN DOE #2; KAREN
MEICHT, Nurse, Hudson Correctional Facility; WINNIE,
Lieutenant, Hudson Correctional Facility; and
COFFEY, John Doe,

                                                          Defendants.[1]

_____

**APPEARANCES:**                                      **OF COUNSEL:**

ERIC JOHNSON
c/o Debah J. Smith
Plaintiff _Pro Se_
126 Albany Avenue #314A
Brooklyn, NY 11213

HON. ERIC T. SCHNEIDERMAN                 DEAN J. HIGGINS, ESQ.
Attorney General for the State of                Assistant Attorney General
   New York
Attorney for Defendants
The Capitol
Albany, New York 12224

_____

        [1] Ankesh Nigam and John Rodgers were also named as defendants in the
amended complaint.  Dkt. No. 64.  On September 18, 2010, their motion for summary
judgment was granted.  Dkt. No. 115.  Further, John Doe George was named as a
defendant in the original complaint (Dkt. No. 1) but he was not named as a defendant in
the amended complaint (Dkt. No. 64).  The amended complaint also fails to allege that
George engaged in any of the alleged unconstitutional conduct.  Accordingly, the Clerk is
directed to terminate him as a party to this action.

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[2]

Plaintiff *pro se* Eric Johnson ("Johnson"), formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. §§ 1983 and 1985 alleging that defendants, twenty-one DOCS employees, violated his constitutional rights.  Am. Compl. (Dkt. No. 64).  Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 119. Johnson has not opposed this motion.  For the following reasons, it is recommended that defendants' motion be granted in its entirety.

### I.  Failure to Respond

Johnson did not oppose defendants' motion.  "Summary judgment should not be entered by default against a pro se plaintiff who has not been given any notice that failure to respond will be deemed a default."  Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Defendants and the Court provided such notice here.  Dkt. Nos. 119-14, 120.  Despite this notice, Johnson failed to respond.  "The fact that there has been no response to a summary judgment motion does not . . . mean that the motion is to be granted automatically."  Champion, 76 F.3d at 436.  Even in the absence of a response, a defendant is entitled to summary judgment only if the material facts demonstrate his or her entitlement to judgment as a matter of law.  Id.; Fed. R. Civ. P. 56(c).

---

[2] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Because Johnson has not responded to raise any question of material fact, the facts–but not the legal conclusions–set forth in defendants' Rule 7.1 Statement of Material Facts (Dkt. No. 119-1) [hereinafter "Defs.' 7.1 Statement"] are accepted as true.  See, e.g., Onanuga v. Pfizer, Inc., 369 F. Supp. 2d 491, 493 n.1 (S.D.N.Y. 2005) (citing Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 72 (2d Cir. 2001); Lopez v. Reynolds, 998 F. Supp. 252, 256 (W.D.N.Y. 1997); see also N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.") (emphasis in original).

Finally, as to those facts not contained in defendants' 7.1 statement, the Court will assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage.  Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir. 1998).  To be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based on "personal knowledge."  Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  While the amended complaint is not notarized as was the original complaint (Dkt. No. 1), the amended complaint contains a statement above Johnson's signature stating, "I declare under penalty that the foregoing is true and correct."  Am. Compl. at 31; Compl. at 21.  Both verifications suffice to require that these documents be considered in opposition to the pending motion as long as the other requirements of Rule 56(c)(4) are satisfied, including personal knowledge, admissibility, and competency.  Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002); Colon v. Coughlin,

3

58 F.3d 865, 872 (2d Cir. 1995).

## II.  Background

In February 2005, while housed at Ulster Correctional Facility, Johnson was diagnosed with Hepatitis B.  Defs.' 7.1. Statement ¶ 18.  He was transferred to Hudson Correctional Facility ("Hudson") on March 15, 2006.  Id. ¶ 19.  Dr. Ayisha Enu, a defendant herein, reviewed Johnson's medical records upon his arrival at Hudson.  Id. ¶ 22.  On March 22, Hudson medical staff performed additional blood tests.  Id. ¶ 24.  Five days later, on March 27, Johnson informed Dr. Enu of his hepatitis diagnosis.  Id. ¶ 23.

Dr. Enu received the results from Johnson's blood tests on September 1.  Id. ¶ 25. The tests revealed that Johnson was HbeAg negative and anti-HBe positive, indicating that he had a variant of Hepatitis B and likely had it "for a very long time.".  Id. ¶¶ 26-27. Dr. Enu then ordered liver function tests and counseled Johnson on the disease and treatment options.  Id. ¶ 28.  Johnson's liver function and Hepatitis B viral load tests were drawn on August 30.  Id. ¶ 29.  Those tests revealed elevated liver enzyme levels as compared to tests conducted earlier in the year.  Id. ¶ 30.  Dr. Enu and Johnson discussed the results on September 5.  Id. ¶ 31.  Johnson stated that he did not believe the results because his liver function tests were always normal.  Id.  Dr. Enu then ordered a repeat of the liver function and Hepatitis B viral load tests.  Id. ¶ 32.

On September 11, 2006, the results from the Hepatitis viral load drawn on August 30, 2006, "revealed a very high [viral load] count."  Defs.' 7.1 Statement ¶ 33.  Four days later, on September 15, Dr. Enu made arrangements for Johnson to see Dr. Rodgers, a gastroenterology specialist at Albany Medical Center Hospital, to discuss Hepatitis

4

treatment.  Id. ¶ 34.  Samples for liver function and Hepatitis B tests were drawn again on

September 20, 2006.  Id. ¶ 35.  Those tests, once again, revealed elevated enzyme levels.

Id.  Dr. Enu saw Johnson again on October 26.  Id. ¶ 36.  Dr. Enu ordered Hepsera for

Johnson, and they discussed the blood and liver function testing regiment that Johnson

would undergo once he started treatment.  Id.

    After starting treatment on October 26, Johnson researched Hepsera and learned of

the complications that could develop if he were to ever stop taking the drug.  Am. Compl.

at 9; see also Defs.' Ex. B (Dkt. No. 119-4) at 263.  Johnson returned to medical staff on

November 3, 2006, because he had questions about the medication.  Defs.' 7.1 Statement

¶ 37.  Dr. Smith, who was covering for Dr. Enu, explained to Johnson the need for follow

up and compliance because Hepatitis B is a chronic disease and that his liver function

tests showed abnormal enzyme levels.  Id.  Johnson returned to the medical department

on November 16 because he was concerned about Hepsera's side effects.  Am. Compl. at

9; see also Defs.' Ex. B at 258.  Nurse Peter Bogarski, a defendant herein, allegedly

ignored Johnson's questions and asked that he be removed from the examination room.

Id.

    Johnson requested permission from his instructor to file a grievance after returning to

his work assignment.  Am. Compl. at 9.  He went to the library to file a grievance directly

with Grievance Officer T. Testo, a defendant herein, but Testo was not present.  Id. at 9-

10.  Johnson took a grievance form and attempted to return to his assignment but he was

stopped by Correction Officer Rother, also a defendant herein.  Id. at 10.  Rother

conducted a pat and frisk of Johnson and told him that he could not file a grievance in

there and to return to his assignment.  Id.  Correction Sergeant John Doe Wolfe,[3] another

defendant herein, escorted Johnson back to his assignment.  Id.  Wolfe then questioned

Instructor Deer about Johnson's "movement."  Id.  Deer stated that he assumed that

Johnson was returning to the medical unit.  Id.  Johnson received a misbehavior report.

Id.

A CT scan was performed on Johnson at Albany Medical Center Hospital on

November 25, 2006.  Defs.' 7.1 Statement ¶ 38.  On November 28, Dr. Enu learned that

the scan revealed a mass on the tail of Johnson's pancreas.  Id. ¶ 39.  Johnson had an

MRI on December 18.  Id. ¶ 40.  Consistent with the results of the earlier CT scan, the

MRI also showed a mass on the tail of Johnson's pancreas.  Id. ¶ 44.  The differential

diagnosis of the MRI "include[d] islet cell tumor, metatastic disease, or carcinoid."  Id. ¶ 45;

see also Defs.' Ex. B at 150.

Nurse Karen Meicht, a defendant herein, examined Johnson on December 13, 2006,

after Johnson complained of stomach problems.  Am. Compl. at 11; see also Defs.' Ex. B

at 256.  Johnson asked when he would see Dr. Rodgers again.  Am. Compl. at 11.  Meicht

told Johnson that he would have to wait until the test results were ready for review.  Id.;

see also Defs.' Ex. B at 256.  Johnson then received some stomach fiber and left the

medical department.  Am. Compl. at 11.

Dr. Enu referred Johnson to Dr. Nigam, a surgeon at Albany Medical College, for a

consultation.  Defs.' 7.1 Statement ¶ 46.  Dr. Nigam's first examined Johnson on January

_____

[3] Defendant Wolfe's name is incorrectly spelled in the amended complaint.  See
Dkt. No. 64.  The correct spelling is Wolfe.  See Defs.' Answer to Am. Compl. (Dkt. No.
79) ¶ 2.

5, 2007, and Johnson agreed to remove the mass on the pancreas surgically.  Nigam Aff. (Dkt. No. 94-2) ¶¶ 9-10.  Four days later, Johnson claims to have written a letter to Bogarski, "requesting further clarity on the proposed surgery."  Am. Compl. at 9.  On January 30, 2007, the day of the scheduled surgery, Johnson expressed his reluctance to proceed with the surgery and wanted more information on other options, including waiting or a biopsy.  Nigam Aff. ¶ 11.  Dr. Nigam warned Johnson that there was a "small risk" that the mass could develop into cancer by waiting.  Id.  Johnson decided not to have the surgery, and on April 5, 2007, Dr. Nigam wrote an order for a biopsy of the pancreas with Dr. Sood.  Id. ¶ 12; Defs.' 7.1 Statement ¶ 49.

Johnson met with defendants Enu, Bogarski, Meicht and Nurse Jane Doe Reuteneaur[4] on February 2, 2007, to discuss follow-up surgical treatment.  Am. Compl. at 14; see also Defs.' Ex. B at 88.  Johnson claims that Enu acted as if the surgery were an elective procedure and focused on the mass on the chest instead of the mass on the pancreas. Am. Compl. at 14.  Reuteneaur allegedly told Johnson that there was nothing that medical staff could do because Johnson refused the surgery.  Id.  Following this meeting, Hudson Deputy Superintendent for Security H.M. Miles, a defendant herein, allegedly removed Johnson from the outside community work crew, "implying" that Johnson had caused a

---

[4]  Both the original complaint and the amended complaint name "Jane Doe Reuteneaur" as a defendant.  Johnson believes that this defendant is female.  See Am. Compl. at 5, 18.  Terry Reuteneaur accepted service of the original complaint.  See Dkt. No. 49.  In support of the present motion, Terry Reuteneaur submitted an affidavit stating that he is male and that the allegations made against Jane Doe Reuteneaur do not refer to him.  Reuteneaur Decl. (Dkt. No. 119-12) ¶¶ 4-5.  Even if the pleadings were served on the incorrect person, no further identification or service upon Jane Doe Reuteneaur is necessary because doing so would be futile as Johnson has failed to state a claim against Jane Doe Reuteneaur.  See discussion infra Point III(D)(4).

disturbance.  Am. Compl. at 14.

On March 1, 2007, Johnson was brought to the medical building after complaining of a "spinning headache."  Defs.' 7.1 Statement ¶ 61; Am. Compl. at 15.  Dr. Enu recommended that Johnson be evaluated at Columbia Memorial Hospital because the Hudson emergency medical staff leaves at 10:00PM, and Johnson's "new symptom" might require emergency medical staff.  Defs.' 7.1 Statement ¶¶ 62-64.  Johnson refused to go to the private hospital.  Id. ¶ 66.  Johnson was then sent to Coxsackie Correctional Facility's Regional Medical Unit ("Coxsackie RMU") for observation.  Id. ¶ 68.  Before returning to Hudson on the next day, Coxsackie RMU medical staff allegedly told Johnson that there was no reason for the transfer.  Am. Compl. at 16.

Upon Johnson's return to Hudson on March 2, Meicht issued Johnson a misbehavior report, accusing Johnson of lying, providing false information, and failing to report an illness.  Am. Compl. at 16; see also Defs.' Ex. D (Dkt. No. 119-6) at 4.  Correction Lieutenant Winnie, a defendant herein, found Johnson guilty.  Defs.' Ex. D at 1.  Johnson received thirty-days in keeplock, and he had recreation, package, commissary, and phone privileges suspended for fifteen days.  Id.

Johnson learned on March 15, 2007, that Dr. Enu requested a change in Johnson's medical level so that he could be transferred.  Id. at 17.  Johnson claims that the real reason for the transfer was because he was "argumentative and problematic."  Id. Johnson also wrote to Bogarski on March 15 to request a "reevaluation of the canceled pancreatic surgery."  Am. Compl. at 17.  Johnson did not receive a response.  Id.

Johnson was transferred to Greene Correctional Facility ("Greene") on March 21, 2007. Defs.' 7.1 Statement ¶ 52.  Upon arriving at Greene, Johnson wrote to Greene

8

Superintendent Peter Behrle, a defendant herein, requesting information on the transfer. Am. Compl. at 18. Greene Deputy Superintendent for Security M. Graziona, also a defendant herein, responded on April 2, 2007, and told Johnson that he was transferred for unspecified medical reasons and that he would return to Hudson once his medical needs were met. Id. Also on April 2, Johnson spoke with Physician John Doe Caulfield, another defendant herein, about the reason for the transfer and biopsy. Id. Johnson claims that Caulfield "made it appear as if [Johnson] were requesting the needle biopsy as an elective procedure," and that it took Caulfield two months to order the biopsy despite the "urgency of [the] condition." Id.

Graziano allegedly wrote to Johnson on June 17, 2007, to inform Johnson that his medical condition was changed, permitting him to transfer out of Greene. Am. Compl. at 19. Three days later, Johnson claims to have received a letter from Correction Counselor T. Gaines, a defendant herein, stating that Johnson's transfer was awaiting approval from the central office in Albany. Id.

On June 6, 2007, while at Greene and under the care of Dr. Sood, Johnson underwent an upper endoscopy ultrasound in an attempt to biopsy the pancreatic mass. Defs.' 7.1 Statement ¶¶ 50-51. The pancreatic mass, however, could not be visualized. Id. ¶ 51. On September 7, 2007, under the care of Dr. Doreen Smith at Greene, Johnson had a CT scan. Id. ¶ 53. This scan showed a stable pancreatic tail mass that had been stable for at least ten months. Id. ¶ 53. Johnson also received a letter on September 7 from Behrle, stating that the transfer back to Hudson was now permissible. Am. Compl. at 19. But two weeks later, on September 21, Johnson received a letter from Gaines, stating that the central office denied the transfer as Greene was the proper facility because of Johnson's

medical condition.  Id. at 20.  Greene Deputy Superintendent Michael Ambrosino, also a

defendant herein, allegedly sent Johnson a letter on September 24 to inform him that his

"medical level" was changed due to a hold placed on Johnson by the parole board on

March 15, 2007.  Id.

While at Greene, Johnson filed two grievances on September 22, 2007.  Am. Compl.

at 23.  One grievance was about the failure to honor his request to speak with Caulfield.

Id.  The other was related to the circumstances of Johnson's transfer to Greene in March

2007.  Id.  Johnson was allegedly told that transfers were not grievable and that the

grievance would not be filed.  Id.  Johnson alleges that it was Defendants John Doe #1[5]

and John Doe #2 who refused to file these grievances.  Id.  On October 3, 2007, Senior

Correction Counselor Tim Mahar, another defendant herein, wrote to Johnson to inform

him that an "unscheduled transfer [has] been submitted."  Am. Compl. at 20.  Johnson

received a letter on October 16 from Greene Deputy Superintendent for Programs Philip

Heath, also a defendant herein, stating that Johnson was "to remain at Greene."  Id.

Johnson returned to Hudson on February 2, 2008.  Defs.' 7.1 Statement ¶ 56.  Dr. Enu

continued to work with Johnson in conjunction with Dr. Nigam and Dr. Rodgers.[6]  Id. ¶ 52.

---

[5]  Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process
be effectuated within 120 days of the date of the filing of the complaint.  See also
N.D.N.Y.L.R. 4.1(b) (service of process must be made within sixty days of the filing of the
complaint).  Because these defendants have not been identified by Johnson or served
with process, it is recommended that the complaint be dismissed without prejudice as to
John Doe #1 and John Doe #2.  No further identification or service upon John Doe #1 or
John Doe #2 are necessary because doing so would be futile as Johnson has failed to
state a claim against these defendants.  See discussion infra Point III(F).

[6]  A detailed discussion of Dr. Nigam's and Dr. Rodgers's involvement in Johnson's
medical treatment can be found in the report and recommendation that recommended
their dismissal.  See Dkt. No. 114.

Dr. Enu saw Johnson on March 28 and April 9, 2008, to discuss the elevated tumor markers.  Id. ¶ 57.  A CT of the liver was scheduled to be performed on May 12, 2008, because of an elevated tumor marker located next to the Hepatic Vein.  Id. ¶ 58. Johnson, however, refused the procedure until he had an opportunity to discuss it with his family.  Id.

On April 28, 2008, Johnson was transferred to Coxsackie RMU for a medical trip. Defs.' 7.1 Statement ¶ 5; Am. Compl. at 22.  Medical Transport Officer John Doe Coffey, a defendant herein, secured Johnson into a transport vehicle with handcuffs, chains, and leg irons.  Defs.' 7.1 Statement ¶ 5.  Johnson alleges that he was fondled in the "groin area" by Coffey during this process.  Am. Compl. at 22.  Johnson claims that this was the third such incident.  Id.  Johnson and Correction Sergeant Wolfe discussed this incident several days later, and Wolfe said that he would conduct an investigation.  Id.  Johnson was scheduled for a medical trip on May 12, 2008.  Id.  He requested that Coffey not be the transport officer for that trip.  Id.  On May 12, however, Coffey was the transport officer, but Wolfe supervised the process.  Id.  Johnson complained that the shackles around his ankles were too tight but Wolfe said that Johnson had enough room.  Id.

Dr. Enu had another appointment to discuss the liver biopsy with Johnson on July 30, 2008.  Id. at ¶ 59.  Johnson refused the procedure.  Id. at 55.  This appointment was the last time that Dr. Enu examined Johnson.  Id. ¶ 54.  Johnson was transferred to Greene on August 15, 2008.  Id. ¶ 60.

## III.  Discussion

### A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits that support the motion.  Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Id. at 586.  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-moving party special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude,"; that a pro se litigant's submissions must be construed

"liberally,"; and that such submission must be read to raise the strongest arguments that they "suggest[.]"  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the *pro se* litigant's allegations, or arguments that the submissions themselves do not "suggest,"; that we should not "excuse frivolous or vexatious filings by *pro se* litigants," and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law."

Id. (internal citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, . . . a court is obliged to construe his pleadings liberally.") (citations omitted).

## B.  Eleventh Amendment Immunity

The Eleventh Amendment prohibits suits against a state in federal court unless the state consents or waives its immunity.  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 (1984).  A suit against a state official in his or her official capacity is a suit against the entity that employs the official.  Mathie v. Fries, 121 F.3d 808, 818 (2d Cir. 1997).  The State has not consented to suit or waived its immunity here. § 1983 claims do not abrogate the Eleventh Amendment immunity of the states.  See Daisernia v. New York, 582 F. Supp. 792, 796 (S.D.N.Y. 1984).  Thus, a suit that seeks monetary damages from an official in his or her official capacity is barred even though asserted against the individual.  Kentucky v. Graham, 473 U.S. 159, 169 (1985).

Johnson has named defendants in their official capacities as DOCS employees.  See Am. Compl. at 2-6.  Although defendants have not moved to dismiss on Eleventh Amendment grounds, it is recommended that the Court sua sponte dismiss any claims

13

against defendants for money damages in their official capacities.  See 28 U.S.C. § 1915(e)(2)(B)(iii).

### C.  Personal Involvement

Personal involvement is an essential prerequisite for § 1983 liability.  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).  A section 1983 defendant, however, cannot be liable "merely because he held a supervisory position of authority."  Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  Supervisory personnel may be considered "personally involved" only if the defendant: (1) directly participated in the alleged constitutional violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that a violation was occurring.  Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[7]

### 1.  McCoy, Duke, and Testo

Besides naming McCoy, Duke, and Testo in the amended complaint, Johnson has made no allegations that those defendants engaged in the alleged unconstitutional conduct.  Accordingly, those defendants should be granted summary judgment.

---

[7] The Supreme Court's decision in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), casts doubt in the continued viability of some of the categories set forth in Colon.  See Sash v. United States, 674 F. Supp. 2d 531 (S.D.N.Y. 2009).  Here, the Court will assume arguendo that all of the Colon categories apply.

14

## 2. Behrle, Graziano, Ambrosino, Heath, Mahar, and Gaines

Behrle, Graziano, Ambrosino, Heath, Mahar, and Gaines either received letters from Johnson or responded to Johnson when he inquired as to why he was transferred to Greene from Hudson.  Id. at 18-20.  Without more, Johnson has not alleged the personal involvement of these defendants in any alleged unconstitutional conduct.  Nor does Johnson allege that he notified these defendants of the alleged unconstitutional conduct. He merely inquired into reasons for the transfer.  See id.

Further, even if Johnson alleged unconstitutional conduct in these letters, the "mere receipt of letters from an inmate by a [supervisory official] regarding [unconstitutional conduct] is insufficient to constitute personal liability."  Gonzales v. Wright, No. 9:06-CV-1424 (JMH), 2010 U.S. Dist. LEXIS 15953, at *28, 2010 WL 681323, at *10 (N.D.N.Y. Feb. 22, 2010) (citations omitted); see also Booker v. Doe, No. 9:06-CV-73 (GLS), 2008 U.S. Dist. LEXIS 76413, at *22, 2008 WL 4527601, at *7 (N.D.N.Y. Sept. 30, 2008) ("It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement.").

Accordingly, these defendants should be granted summary judgment.


## D. Pendent State Law Claims

To the extent that Johnson's claims may be construed as pendent state law claims alleging lack of informed consent prior to treatment, such claims must fail.  Federal courts have supplemental jurisdiction over pendent state law claims pursuant to 28 U.S.C. § 1367.  It is recommended, herein, however, that defendants be granted summary

judgment on Johnson's federal claims against them on which rests federal jurisdiction over the pendent state law claims.  Johnson asserts no other basis for the Court's jurisdiction over these claims and, therefore, the Court should decline to exercise supplemental jurisdiction over Johnson's state law claims if the recommendations are accepted.  See 28 U.S.C. § 1367(c)(3).  Such causes of action should be dismissed without prejudice.

Moreover, even if the state law claims are addressed, they still fail.  In order to state an actionable claim for failure to provide informed consent:

> plaintiff must prove (1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury.

Foote v. Rajadhyax, 702 N.Y.S.2d 153, 153 (N.Y. 2000) (citations omitted).  In this case, there is nothing in the record to show that the medical treatment that any of the defendants provided were the proximate cause of Johnson's injuries.  In fact, there is nothing to show that Johnson was injured at all.

### E. Deliberate Medical Indifference

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  This prohibition extends to the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold.  First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Second, the

prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d158, 162-63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703. As such, "disagreements over medications, diagnostic techniques (e.g., the need for

17

X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a section 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).  Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

In this case, defendants do not appear to challenge the fact that Hepatitis B and its potential complications or the resulting malignancies in Johnson's pancreas were serious medical needs.  Rather, defendants contend that they were not deliberately indifferent.


### 1.  Dr. Enu

Johnson contends that Dr. Enu was not receptive enough to a biopsy when the liver tumor was first discovered in 2006, refused to follow the advice of specialists who recommend a biopsy, and failed to refer Johnson to an oncologist.  Am. Compl. at 25-26.

First, mere disagreements on treatment between a prison inmate and his doctor do not rise to the level of a constitutional violation.  Sonds, 151 F. Supp. 2d at 312.  Likewise, even if other doctors, as Johnson argues, disagreed with Dr. Enu's prescribed treatment, Dr. Enu is entitled to his own medical judgment and the mere fact that he disagreed with other medical professionals is insufficient to show deliberate indifference even if Dr. Enu's judgment was misguided or negligent.  See Ortiz v. Makram, No. 96 Civ. 3285, 2000 WL 1876667, at *10 (S.D.N.Y. Dec. 21, 2000).

Also, Johnson's refusal of the prescribed treatment further negates allegations of deliberate indifference.  See Gillard v. Rovelli, No. 9:09-CV-0860 (NAM/GHL), 2010 WL

4905240, at *10 (N.D.N.Y. Sept. 29, 2010) (Lowe, M. J.) (citing Rivera v. Goord, 253 F. Supp. 2d 735, 756 (S.D.N.Y. 2003)).  On May 14, 2008, Johnson refused a CT of his liver to evaluate whether a mass had become cancerous or spread.  Defs.' Ex. B at 36-38.  He refused the CT scan once again on June 19, 2008.  Id. at 32-34.  Finally, on July 30, 2008, Johnson refused a liver biopsy.  Id. at 29.  While Johnson might have refused the prescribed treatment because he disagreed with them, prisoners are not afforded the medical treatment of their choice.  Chance, 143 F.3d at 703.

Finally, a review of Johnson's medical records fails to reveal any indication or suggestion that Dr. Enu was deliberately indifferent to Johnson's serious medical needs. Upon Johnson's transfer to Hudson on March 15, 2006, Dr. Enu reviewed Johnson's medical records.  Defs.' Ex. B at 273.  Dr. Enu conducted a physical examination of Johnson and learned of his Hepatitis B diagnosis approximately a week and a half later on March 27.  Id. at 272. Dr. Enu ordered blood and liver function tests to evaluate Johnson's condition and repeated the tests after Johnson refused to believe the results.  Defs.' Ex. B at 269-70.  Dr. Enu also referred Johnson to outside specialists or other medical personnel when Hudson's facilities would be unable to provide assistance.  Id. at 164 (consultation notes of Dr. Nigam reference referral from Dr. Enu), 176-80 (transfer to Coxsackie RMU because Johnson needed emergency care), 268 (ambulatory health record noting referral to a gastroenterology specialist).  There is no indication that Dr. Enu was deliberately indifferent to Johnson's medical needs during the eighteen-month period that Johnson was under Dr. Enu's care.

Accordingly, defendants' motion as to Dr. Enu should be granted on this ground.

19

**2. Dr. Caulfield**

Johnson asserts a delay in medical treatment claim against Dr. Caulfield.  Am. Compl. at 18.  A "delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.'" Thomas v. Nassau County Corr. Ctr, 288 F. Supp. 2d 333, 339 (E.D.N.Y. 2003) (internal quotation marks omitted) (citing Chance, 143 F. 3d at 703).  "The Second Circuit has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." Thomas, 288 F. Supp. 2d at 339 (internal quotation marks omitted) (citing Espinal v. Coughlin, No. 98 Civ. 2579, 2002 U.S. Dist. LEXIS 20, 2002 WL 10450, at *3 (S.D.N.Y. Jan. 3, 2002)).  Even if a prisoner is able to establish delay, he must also show that his condition became worse or deteriorated as a result of the delay.  Thomas, 288 F. Supp. 2d at 339.

The record is devoid of any facts demonstrating that Dr. Caulfield delayed the procedure as a form of punishment, ignored a life threatening and fast-degenerating condition, or delayed major surgery.  Johnson accuses Dr. Caulfield of waiting two months before ordering a needle biopsy.  Am. Compl. at 18.  Johnson claims that Dr. Caulfield acted as if the procedure were elective, and he appeared to have no knowledge of Dr. Nigam's "order for a needle biopsy." Id.  Johnson also believed that the procedure was required immediately because of the "urgency of [his] condition." Id.  There is no indication, however, that the needle biopsy was an urgent procedure.  Dr. Nigam merely stated that delaying pancreatectomy and spleenectomy in favor of a biopsy would mean a "small risk of cancer."  Defs.' Ex. A (Dkt. No. 119-3) at 38.  Moreover, Johnson has failed

20

to proffer any evidence that his condition deteriorated or became worse as a result of the delay.

Accordingly, Dr. Caulfield should be granted summary judgment on to this ground.

### 3.  Bogarski

Bogarski, a nurse administrator, is accused of ignoring Johnson's questions and concerns about Hepsera, and removing Johnson from the examination room for no reason on November 17, 2006.  Am. Compl. at 9.  An ambulatory health record signed by Bogarski and dated November 17, 2006, indicates that Johnson became "verbally upset" and "uncooperative" as an "inquisition into [Johnson's] health history [was] attempted." Defs.' Ex. B at 258.  Johnson "was asked to leave the medical office," and security was notified.  Id.  6.

Johnson also accuses Bogarski of ignoring two letters where Johnson inquired about the need for pancreatic surgery and a reevaluation for the canceled pancreatic surgery. Am. Compl. at 9, 17.  On January 9, 2007, four days after Johnson's surgical consultation with Dr. Nigam, Johnson sent a letter to Bogarski, "requesting further clarity on the proposed surgery."  Id. at 9.  Then on March 17, 2007, approximately a month and a half after the surgery was canceled, Johnson wrote to Bogarski to request a reevaluation of the canceled surgery.  Id. at 17.  It does not appear that Bogarski responded to either of these letters.  See id.

These allegations fail to establish deliberate indifference on the part of Bogarski. There is no indication that Johnson failed to receive medical care and treatment for his conditions after Bogarski asked him to leave the medical department on November 17,

2006, or after Bogarski allegedly ignored Johnson's letters.  Johnson continued to receive medical evaluations and monitoring of his liver conditions by medical staff.  See generally Defs.' Ex. B.

Accordingly, defendants should be granted summary judgment on this ground.

### 4.  Reuteneaur

Reuteneaur, a nurse, was allegedly present at a February 2, 2007, medical appointment that Johnson had with Dr. Enu.  Am. Compl. at 14; see also Defs.' Ex. B at 88 (ambulatory health record signed by Dr. Enu showing a medical consult on February 2, 2007).  After Dr. Enu told Johnson that he would receive a biopsy when the need for one arose, Johnson asked what his treatment would be should his condition become serious. Am. Compl. at 14.  Reuteneaur allegedly told Johnson that "there would be nothing [that medical staff] could do" because Johnson refused the surgery.

While Johnson may contend that this amounted to deliberate indifference, Johnson has proffered no facts to support this conclusory statement.  Moreover, a review of the record further belies a deliberate indifference claim as Johnson continued to receive medical evaluations to monitor the progression of his disorders.   See generally Defs.' Ex. B.  Accordingly, summary judgment as to Reuteneaur should be granted.

### 5.  Meicht

Nurse Meicht examined Johnson on December 13, 2006, because Johnson was experiencing stomach discomfort.  Am. Compl. at 11; Defs.' Ex. B at 256.  Johnson

received stomach fiber before leaving.  Am. Compl. at 11.  Meicht also made an

appointment for Johnson to see Dr. Enu.  Defs.' Ex. B at 256.  Without more, there is

nothing to show that Meicht acted with deliberate indifference to Johnson's medical needs.

Accordingly, Meicht should be granted summary judgment on this ground.


## F.  Misbehavior Report and Keeplock Confinement

The amended complaint alleges that Meicht issued a false misbehavior report against

Johnson on March 2, 2007.  Am. Compl. at 16.  Johnson possessed no constitutional right

to be free "from falsely or wrongly accused of conduct which may result in the deprivation

of a protected liberty interest," but he is still entitled "not to be deprived of a protected

liberty interest without due process of law."  Freeman v. Rideout, 808 F.2d 949, 951 (2d

Cir. 1986).  Thus, a fair hearing would cure any due process violations resulting from false

accusations.  Grillo v. Coughlin, 31 F.3d 53, 56 (2d Cir. 1994); Livingston v. Kelly, 561 F.

Supp. 2d 329, 331 (W.D.N.Y. 2008) ("As the Second Circuit noted . . . , an inmate's

allegation that he has been found guilty of false disciplinary charges may support a

constitutional claim if he also alleges that he was denied the minimal procedural due

process protections . . . .").

To prevail on a procedural due process claim under section 1983, a plaintiff must show

that he possessed a protected property or liberty interest, and that he was deprived of that

interest without being afforded sufficient procedural safeguards.  See Tellier v. Fields, 280

F.3d 69, 79-80 (2d Cir. 2000); Hynes v. Squillace, 143 F.3d 653, 658 (2d Cir. 1998).  Also,

due process generally requires that a state afford individuals "some kind of hearing" prior

to depriving them of a liberty or property interest.  DiBlasio v. Novello, 344 F.3d 292, 302

(2d Cir. 2003).

To establish a protected liberty interest, a prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84 (1995).  This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. Id. at 484; Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996).  The fact that an inmate has been disciplined with confinement in keeplock[8] or a special housing unit[9] alone is insufficient to establish an atypical and significant deprivation.

Hearing Officer Winnie sentenced Johnson to thirty-days in keeplock confinement. Defs.' Ex. D at 1.  Winnie also suspended Johnson's recreation, package, commissary, and phone privileges for fifteen days.  Id.  District courts have noted that "decisions in the Second Circuit are unanimous that keeplock . . . of 30 days or less in New York prisons is not 'atypical or significant hardship' under Sandin."  Auleta v. LaFrance, 233 F. Supp. 2d 396, 398 (N.D.N.Y. 2010) (citing Williams v. Keane, No. Civ. 95-0379 (AJP) (JGK), 1997 WL 527677, at *6-8 (S.D.N.Y. Aug. 25, 1997) (Peck, M. J.) (citing cases)).  Moreover, "the loss of phone, telepackage, and commissary privileges does not give rise to a protected liberty interest under New York law."  Smart v. Goord, 441 F. Supp. 2d 631, 640 (S.D.N.Y.

---

[8]"Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6.

[9]SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

2006) (citing <u>Husbands v. McClellan</u>, 990 F. Supp. 214, 217 (W.D.N.Y. 1998), citing in turn <u>Frazier v. Coughlin</u>, 81 F.3d 313, 317 (2d Cir. 1996)).  Thus, Johnson did not have a protected liberty interest.

Even if Johnson had a protected liberty interest, he received a fair and impartial hearing.  While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process.  <u>Wolff v. McDonnell</u>, 418 U.S. 539, 556, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974).  Prisoners are "entitled to advance written notice . . . ; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken."  <u>Sira v. Morton</u>, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).  Due process requires written notice twenty-four hours prior to the commencement of a formal disciplinary hearing in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are . . . ."  <u>Wolff</u>, 418 U.S. at 564 (citations omitted).  "The effect of the notice should be to compel the charging officer to be sufficiently specific as to the misconduct . . . charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges . . . ."  <u>Taylor v. Rodriguez</u>, 238 F.3d 188, 192-93 (2d Cir. 2001) (citations omitted).  Such notice guarantees a meaningful hearing whereupon a prisoner can properly defend himself against the pending charges.  <u>Id.</u> at 193.

Here, the misbehavior report was delivered on March 2, 2007, and the hearing was held on March 8, 2006, giving Johnson six days to prepare a defense.  Defs.' Ex. D at 1.  Johnson also had the opportunity to present a defense, and he declined to call any

witnesses.  Id. at 2-3.  Accordingly, defendants should be granted summary judgment 0n this claim.

### G.  Interference with Grievance Process

Johnson accuses Rother, John Doe #1, and John Doe #2 of interfering with grievances that he had filed.  Am. Compl. at 10, 23.  The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances.  See 370 Bill Johnson's Rest., Inc. v. NLRB, 461 U.S. 731, 741, 103 S. Ct. 2161 (1983).  However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim.  Cancel v. Goord, No. 00 Civ.2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001).  If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim.  See Flick v. Alba, 932 F.2d 728, 729 (8th Cir.1991).  "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983."  Cancel, 2001 WL 303713, at *3; see also Torres v. Mazzuca, 246 F. Supp. 2d 334, 342 (S.D.N.Y.2003); Mahotep v. DeLuca, 3 F. Supp. 2d 385, 390 (W.D.N.Y.1998).

Accordingly, it is recommended that defendants be granted summary judgment on this ground.

**H.  Sexual Harassment**

Johnson claims that he was fondled in the "groin area" by Coffey on three separate

occasions.  Am. Compl. at 22.  The Eighth Amendment explicitly prohibits the infliction of

"cruel and unusual punishment." U.S. Const. amend. VIII. It is well settled that the

"unnecessary and wanton infliction of pain on a prisoner constitutes cruel and unusual

punishment in violation of the Eighth Amendment."  Boddie, 105 F.3d 857, 861 (2d Cir.

1997) (citing Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251

(1986)).  In order to prove a violation of the Eighth Amendment, a plaintiff must satisfy

both an objective and a subjective inquiry.  See Trammell v. Keane, 338 F.3d 155, 161 (2d

Cir. 2003).  A prison official violates the standards of the Eighth Amendment when (1) the

alleged punishment is "objectively, sufficiently serious" and (2) he or she acted with a

"sufficiently culpable state of mind."  Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct.

1970, 128 L. Ed. 2d 811 (1994).  Because sexual abuse by a prison official with a culpable

state of mind may constitute a violation of contemporary standards of decency and cause

severe harm to the prisoner, such allegations may be cognizable under the Eighth

Amendment.  Boddie, 105 F.3d at 861 ("[S]evere or repetitive sexual abuse of an inmate .

. . can be 'objectively, sufficiently serious.'"); see also Farmer, 511 U.S. at 834-35 ("[The]

rape of one prisoner . . . serves no legitimate penological objective, any more than it

squares with evolving standards of decency.") (internal quotation marks and citations

omitted).

On the other hand, sexual harassment violates the Eighth Amendment only if the harm

is "objectively, sufficiently serious."  Boddie, 105 F.3d at 861.  The Second Circuit has held

that a small number of isolated incidents of alleged sexual abuse, including verbal

harassment, may not suffice to meet the objective prong of the test or involve a harm of a federal constitutional level.  Id.  Further, a plaintiff must demonstrate that an incident or series of incidents were sufficiently egregious to be "objectively, sufficiently serious" to the point where such actions resulted in the denial of "the minimal civilized measure of life's necessities" and posed a substantial risk of serious harm.  Id.; Trammel, 338 F.3d at 161.  The Supreme Court has also held that a plaintiff must prove that a defendant used force "maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 112 S. Ct. 995 (1992).

Coffey is a corrections officer, and his responsibility includes serving as a "transport officer for prisoners being taken to various places away from Hudson."  Coffey Decl. (Dkt. No. 119-11) ¶¶ 1, 5.  While securing a prisoner for transport, departmental policy requires securing the prisoner in a particular way, including placing a chain around the prisoner's waist.  Id. ¶ 9.  Occasionally, an "extra length chain is positioned so that it comes in contact with the prisoner's groin and waist area."  Id. ¶ 10.  Coffey states that his hands never came in contact with Johnson's groin area on the day in question.  Id. ¶ 15.  A DOCS investigation concluded that Johnson's allegations against Coffey were without merit.  See Defs.' Ex. E (Dkt. No. 119-7) at 11-21.

Even if Coffey's hands had come into contact with Johnson's groin area while securing Johnson for transport, Johnson's allegations are insufficient to articulate a claim of constitutional dimensions.  In Boddie, the Second Circuit dismissed as inadequate a prisoner's claim that a female corrections officer made a possible pass at him, squeezed his hand, touches his penis called him a "sexy black devil," pressed her breasts against his chest, and pushed her vagina against his penis.  Boddie, 105 F.3d at 859-61.  The

28

Second Circuit concluded that no single incident was "severe enough to be 'objectively, sufficiently serious,' [n]or were the incidents cumulatively egregious in the harm they inflicted" to "involve harm of federal constitutional proportions as defined by the Supreme Court." Id. at 861; see also Morales v. Mackalm, 278 F.3d 126, 132 (2d. Cir. 2002) (allegations that staff member asked plaintiff to have sex with her and to masturbate in front of her and other staff members "do not even rise to the level of those made by the plaintiff in Boddie, [and] do not state a claim for sexual harassment in violation of the Eighth Amendment to the United States Constitution."); Excell v. Fischer, 08-CV-945, 2009 WL 3111711, at *6-7 (N.D.N.Y. Sep. 24, 2009) (Hurd, J., adopting Report-Recommendation on de novo review) (claim that officer grabbed and squeezed plaintiff's penis during strip search for contraband relates a "quick, isolated incident of inappropriate touching" but not an Eighth Amendment violation); Davis v. Castleberry, 364 F. Supp. 2d 319, 321 (W.D.N.Y. 2005) (allegation that corrections officer grabbed inmate's penis during pat frisk is insufficient to state constitutional claim); Morrison v. Cortright, 397 F. Supp. 2d 424, 425 (W.D.N.Y. 2005) (allegations that a corrections officer touched plaintiff's buttocks, and that another "rubbed up against plaintiff['s] buttocks with [the officer's] private part" during a strip search describe an isolated incident unaccompanied by physical injury, and therefore are not sufficiently serious to establish a constitutional claim); Montero v. Crusie, 153 F. Supp. 2d 368, 373, 375 (S.D.N.Y. 2001) (allegation that corrections officer squeezed inmate's genitalia during pat-frisks on several occasions does not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such conduct).

Accordingly, Coffey should be granted summary judgment as on this claim.

29

## I. Excessive Force

On May 12, 2008, while securing Johnson for transport, Coffey allegedly placed the leg irons "extremely tight."[10]  The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983.  Hudson v. McMillian, 503 U.S. 1, 9-10 (1992).  The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain."  Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000).  To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements.  Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection."  Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262.  However, "the malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation per se" regardless of the seriousness of the injuries.  Blyden, 186 F.3d at 263 (citing , 503 U.S. at 9).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  Hudson, 503 U.S. at 9-10 (citations omitted).  "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,

---

[10]  Although Johnson characterized this incident as a form of harassment (Dep. Tr. at 23), it is more appropriately analyzed as an excessive force claim.

violates a prisoner's constitutional rights.'" Sims, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Id. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. (quoting Hudson, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] . . . the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

In this case, Johnson fails both prongs of the Eighth Amendment analysis. The alleged exertion of force resulted in no medically determinable injury to Johnson as a medical examination following the incident revealed "no bruises, no open areas, [and] no swelling" around Johnson's ankles. Defs.' Ex. B at 39-41. Moreover, an investigation concluded that Johnson was not shackled too tightly at all. Defs.' Ex. E (Dkt. No. 119-7) at 29. Johnson has proffered no evidence to raise an issue of material fact as to whether excessive force was used in this instance.

Accordingly, defendants should be granted summary judgment on this claim.

**J.  Verbal Harassment**

Johnson claims that he was verbally harassed.  Am. Compl. at 29.  Verbal harassment alone, however, is not actionable under § 1983.  See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986) ("The claim that a prison guard called [plaintiff] names . . . did not allege any appreciable injury and was properly dismissed."); Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("[V]erbal harassment or profanity alone unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem do not constitute the violation of any federally protected right and therefore is not actionable under . . . § 1983.").  Accordingly, defendants' should be granted summary judgment as to this claim.


**K.  Retaliation**

Johnson alleges defendants' engaged in unconstitutional conduct in retaliation for Johnson's filing of grievances.  Am. Compl. at 29-30.  To state an actionable claim for retaliation, a plaintiff must first allege that his conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996); see also Lipton v. County of Orange, 315 F. Supp. 2d 434, 447-48 (S.D.N.Y. 2004) (applying First Amendment retaliation factors to a pretrial detainee complaint).  "Adverse action" is action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.  See Mt. Healthy Cit. Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  Courts must view retaliation claims with care and skepticism to avoid judicial

32

intrusion into matters of prison administration.  <u>Jackson v. Onondaga County</u>, 549 F.

Supp. 2d 204, 214-15 (N.D.N.Y. 2008).  Conclusory allegations alone are insufficient.  <u>Id.</u>

at 214 (citing <u>Flaherty v. Coughlin</u>, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s]

supported by specific and detailed factual allegations . . . ought usually be pursued with

full discovery.")).

　　The filing of grievances is a constitutionally protected activity.  <u>See</u> <u>Davis v. Goord</u>, 320

F. 3d 346, 352-53 (2d Cir. 2003).  Johnson, however, has failed to allege facts sufficient to

support a retaliation claim.  Johnson has only stated in conclusory terms that defendants

were retaliating against him for filing grievances.  Johnson offers no evidence to support

his allegations, either through documentation or witness testimony.  Thus, he has failed to

allege specific facts from which one could conclude that defendants' actions were

motivated by Johnson's constitutionally protected activities.


## L.  Conspiracy

　　Johnson alleges that defendants conspired together to deprive him of his constitutional

rights.  Am. Compl. at 30.  "Section 1985 prohibits conspiracies to interfere with civil

rights."  <u>Davila v. Secure Pharmacy Plus</u>, 329 F. Supp. 2d 311, 316 (D. Conn. 2004).  To

state a claim for relief under § 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any
> person or class of persons of the equal protection of the laws, or of equal
> privileges and immunities under the laws; and (3) an act in furtherance of the
> conspiracy; (4) whereby a person is either injured in his person or property or
> deprived of any right of a citizen of the United States.

<u>United Bd. of Carpenters & Joiners of Am.</u>, Local 610 v. Scott, 463 U.S. 825, 828-29

(1983); <u>see also</u> <u>Iqbal v. Hasty</u>, 490 F.3d 143, 176 (2d Cir. 2007).  "In addition, the

33

conspiracy must be motivated by some class-based animus." <u>Hasty</u>, 490 F.3d at 176 (citations omitted).

Here, Johnson does not assert any facts giving rise to a conspiracy. First, Johnson vaguely asserts conclusory statements relating to an alleged conspiracy among defendants. This is insufficient. <u>See generally</u> <u>Thomas v. Roach</u>, 165 F.3d 137, 147 (2d Cir. 1999) (granting summary judgment for a § 1985(3) claim where the "assertions were conclusory and vague, and did not establish the existence of an agreement among defendants to deprive [plaintiff] of his constitutional rights."). Second, there has been proffered no evidence relating to agreements, or even communications, between the defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive Johnson of his civil rights. Lastly, there is no evidence that any alleged conspiracy was motivated by racial- or class-based animus.

Accordingly, defendants' motion as to this claim should be granted.


### M. Qualified Immunity

Defendants also argue that they are entitled to qualified immunity. Defs.' Mem. of Law (Dkt. No. 119-13) at 12. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Aiken v. Nixon</u>, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002), aff'd, 80 F. App'x 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available if it

34

was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991) (citing Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation.  Aiken, 236 F. Supp. 2d at 230.  Here, as discussed supra, accepting all of Helmer's allegations as true, he has not shown that defendants violated his constitutional rights.

Accordingly, it is recommended in the alternative that defendants' motion on this ground be granted.


## IV.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 119) be **GRANTED** in its entirety and that judgment be entered in favor of all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.D.N.Y.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v.

Racette, 984 F.2d 85 (2d Cir. 1993) (citing Small v. Secretary of Health and Human

Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).


DATED:  July 13, 2011

David R. Homer
U.S. Magistrate Judge